Richard F. Holley, Esq. (NV Bar No. 3077)
Email: rholley@nevadafirm.com
Mary Langsner, Ph.D. (NV Bar No. 13707)          E-filed on August 28, 2020
Email: mlangsner@nevadafirm.com
HOLLEY DRIGGS
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/791-0308
Facsimile:    702/791-1912
*Attorneys for PowerUp Lending Group, Ltd.; and EMA Financial, LLC*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>PHARMAGREEN BIOTECH, INC.,<br><br>Debtor. | Case No. 20-50780-BTB<br>Chapter 11<br><br>**MOTION TO DISMISS BANKRUPTCY CASE**<br><br>Date of Hearing:    September 30, 2020<br>Time of Hearing:        2:00 p.m.<br>Place:  Courtroom No. 2,<br>            C. Clifton Young Federal Building<br>            & U.S. Courthouse<br>            300 Booth Street<br>            Reno, Nevada 89509<br>Court Hearing Participation Phone Conference<br>Number (888) 684-8852 /<br>Access Code 2981680#<br><br>Judge:  Hon. Bruce T. Beesley |

PowerUp Lending Group, Ltd. ("PowerUp") and EMA Financial, LLC ("EMA") (collectively with PowerUp, "Creditors"), by and through their undersigned counsel Richard F. Holley, Esq. and Mary Langsner, Ph.D. of the law firm Holley Driggs, hereby file this Motion to Dismiss Bankruptcy Case ("Motion").  The Motion seeks the dismissal of the bankruptcy case ("Case") of debtor Pharmagreen Biotech, Inc. (alternatively "Debtor" or "Pharmagreen"), pursuant to 11 U.S.C. § 305(a) or, alternatively, pursuant to 11 U.S.C. § 1112(b) on the grounds that Pharmagreen does not qualify as a debtor based on its contemplated business operations which include the cultivation and sale of marijuana.  The cultivation and sale of marijuana is not legal under the Controlled Substances Act.

14280-01/2495768.docx

1    This Motion is supported by the papers and pleadings on file in this Case, judicial notice

2  of which is respectfully requested pursuant to FED. R. EVID. 201(b) and (c) and 1101(a) and (b);

3  the Memorandum of Points and Authorities herein; the Declaration of Mary Langsner, Ph.D.

4  ("Langsner Decl."), concurrently filed herewith pursuant to Local Rules of Bankruptcy Practice of

5  the United States District Court for the District of Nevada ("LR") 9014(c); and any oral argument

6  the Court entertains at hearing on this Motion.

7    Dated this 28th day of August 2020.

8    **HOLLEY DRIGGS**

9    /s/ Richard F. Holley
     Richard F. Holley, Esq. (NV Bar No. 3077)
10   Mary Langsner, Ph.D. (NV Bar No. 13707)
     400 South Fourth Street, Third Floor
11   Las Vegas, Nevada 89101

12   *Attorneys for PowerUp Lending Group, Ltd.;*
     *and EMA Financial, LLC*

13

14   **MEMORANDUM OF POINTS AND AUTHORITIES**

15   **I.    JURISDICTION**

16    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and 157, and

17  LR 1001(b)(1). Adjudication of the Motion constitutes a core proceeding pursuant to 28 U.S.C.

18  §§ 157(b)(2)(A) and (O).  Pursuant to LR 7008, Creditors consent to the entry of final orders or

19  judgment by the bankruptcy judge if it is determined that the bankruptcy Court, absent consent of

20  the parties, cannot enter final orders or judgment consistent with Article III of the United States

21  Constitution.

22   **II.    INTRODUCTION**

23    Aside from the fact that the Debtor has not scheduled any real or personal property assets,

24  no historical or current income and has no current ability to generate revenue, the primary reason

25  for dismissing this bankruptcy case is simple:  Pharmagreen does not qualify as a debtor under the

26  Bankruptcy Code.  According to documents recently filed with the Security and Exchange

27  Commission ("SEC") and statements and representations made on Pharmagreen's website,

28  Pharmagreen's business model is based primarily, if not exclusively, on the cultivation and sale of

- 2 -

1    marijuana plants and product.  The cultivation and sale of marijuana is federally prohibited and in

2    violation of the Controlled Substance Act ("CSA").  A bankruptcy case must be dismissed if the

3    continuation of the case would require the court, trustee, or debtor in possession to administer

4    assets that are illegal under the CSA or that constitute proceeds of activity criminalized by

5    the CSA.

6                        **III.    STATEMENT OF RELEVANT FACTS**

7          1.      On August 7, 2020 ("Petition Date"), Debtor Pharmagreen Biotech, Inc. filed a

8    skeletal voluntary chapter 11 Petition ("Petition") [ECF No. 1].[1]

9          2.      Peter Wojcik ("Mr. Wojcik"), as Debtor's President, signed the Petition [ECF No. 1

10   p. 4 of 24]; signed the Debtor's Schedules and Statements [ECF No. 28 p. 15 of 15; ECF No. 29

11   p. 9 of 9]; signed the Debtor's Amended Petition [ECF No. 11]; and is identified as the "**Sole**

12   **Director/Officer**" of the Debtor [ECF No. 29 pp. 7-8 of 9] (emphasis added).

13         3.      The Petition identifies the Debtor's principal place of business at 12 North Curry

14   Street in Carson City, Nevada, 89703,[2] and attests that Debtor "has had its domicile, principal

15   place of business, or principal assets in this district for 180 days immediately preceding the date

16   of this petition or for a longer part of such 180 days than in any other district." *See* ECF No. 1

17   pp. 1-3 of 24.  Upon information and belief, this address is nothing more than a mail drop. *See*

18   Langsner Decl. at ¶8.

19   **THE 10-Q**

20         4.      Eighty days prior to the Petition Date, Debtor filed with the Securities and

21   Exchange Commission ("SEC") its Form 10-Q Quarterly Report for the period ending March 31,

22   2020 (the "10-Q").  *See* **Exhibit "1"** to Langsner Decl.

23         5.      The 10-Q, was filed under criminal penalty with the SEC and signed by Peter

24   Wojcik as the Debtor's President and Chief Executive Officer.  In the 10-Q, the Debtor identifies

25

26   ---
[1] All references to "ECF No." are to the numbers assigned to the documents filed in the bankruptcy Case as they
27   appear on the docket ("Docket") maintained by the Clerk of the Court of the United States Bankruptcy Court for the
     District of Nevada.

28   [2] Later amended to read 112 North Curry Street.  *See* ECF No. 11 ("Amended Petition") at p. 2 of 5.

14280-01/2495768.docx

1    its principal executive offices as located in British Columbia, Canada, at 2987 Blackbear Court,

2    Coquitlam, British Columbia, V3E3A2.  *See* **Ex. 1** to Langsner Decl.

3        6.    The 10-Q describes the nature of Debtor's business and continuance of operations

4    in pertinent part as follows:

5        [O]n May 2, 2018, the Company changed its name . . . and changed
         its principal business to the construction of a biotech complex in
6        Deroche, British Columbia, Canada,[3] for the purpose of producing
         a variety of starter plantlets for the Canadian and international **high**
7        **CBD hemp and medical cannabis industries** through the
         application of the proprietary plant tissue culture in vitro process
8        called "Chibafreen"[4].

9    *See* **Ex. 1** to Langsner Decl. at p. 7 (emphasis added).

10        7.    Regarding Debtor's Commitments, Section 10 of the 10-Q begins with:

11        Effective December 11, 2017, the Company entered into a binding
         Letter of Intent ("LOI") with Alliance Growers Corp. ("Alliance"),
12        whereby the Company will build a new cannabis biotech complex
         located in Deroche, British Columbia, **through their subsidiary,**
13        **115BC**.

14    *See* **Ex. 1** to Langsner Decl. at p. 15 (emphasis added).

15        8.    In addition, Item 2 of the 10-Q describes the Debtor's current business, in part, as:

16        The Company's mission is to advance the technology of tissue
         culture science and to provide the highest quality 100% germ free,
17        disease free and all genetically the same **plantlets of high CBD**
         **hemp and other flora** and offering full spectrum DNA testing for

18

---

[3] Regarding Pharmagreen's progress toward construction of the Center, Item 2 of the 10-Q ("Our Current Business")
19    provides in pertinent part:

20        On February 7, 2019, The Company's, [sic] wholly owned Canadian subsidiary,
         WFS Pharmagreen Inc., received notification from Health Canada that its
21        cannabis licensing application under the Cannabis Act and the Cannabis
         Regulations to obtain a license at the proposed site in Deroche, British Columbia,
22        Canada has advanced from the first state, "Intake and Screening" to the second
         stage, "Detailed Review and Initiation of Security Clearance Process," of a three
23        stage approval process.  On May 10, 2019, the Company received confirmation
         from Health Canada that the second stage review was completed and that the
24        Company can proceed to the third and final stage, construction of the biotech
         complex for final inspection and licensing.

25    *See* **Ex. 1** to Langsner Decl. at p. 18.

26    [4] Elsewhere, the Debtor describes Chibafreen as "a new, highly evolved, state-of-the-art in vitro plant production
      method . . . introduced by the company Botanical Research In Motion Inc. (B.R.I.M.) **for exclusive use by WFS**
27    **Pharmagreen Inc.** for . . . transplant production in the company's Botany Center."  *See* **Exhibit "3"** to Langsner
      Decl. (emphasis added).  Notably, any executory contract(s) related to the proposed exclusive use were not scheduled.
28    *See* Schedule G, ECF No. 28 p. 11 of 15 (Debtor answered "No" to any executory contracts or unexpired leases).

- 4 -

1
2
3

plant identification, live genetics preservation using low temperature storage **for various cannabis and horticulture plants**; extraction of **botanical oils mainly CBD oil**, and to deliver laboratory based services to the North American **high CBD hemp, Cannabis and agriculture** sectors.

4    *See* **Ex. 1** to Langsner Decl. at p. 17 (emphases added).  This continues:

5
6
7

[Debtor's] **immediate focus will be on producing tissue cultured high CBD help starter plantlets**.   In the early part of 2018, the Company's wholly owned Canadian subsidiary, WFS Pharmagreen Inc., applied to Health Canada for a license to produce and sell **tissue culture plantlets and cannabis oil**.

8    *See* **Ex. 1** to Langsner Decl. at p. 18 (emphases added).[5]

9    **DEBTOR'S WEBSITE AVERS THAT OPERATIONS ARE PREMISED ON ITS MARIJUANA BUSINESS**

10
11
9.    In addition to the 10-Q filed with the SEC, Pharmagreen has published on its website (the "Website") a number of statements concerning its business operations.

12
13
14
10.    On its "Projects" page, the Website advertises "an innovative and proprietary design of a 63,000 sq. ft. [] building complex" termed the Cannabis/Botany Biotech Complex, or the Cannabis/botany Biotech Centre (the "Center").  *See* **Exhibit "2"** to Langsner Decl.

15
16
17
11.    Debtor also advertises that construction of the Center is expected to take twenty-four months to complete and notes the Center will include "an all-year-round greenhouse operation in support of its starter plantlets sales for high CBD hemp farming."  *See id.*

18
19
20
12.    The greenhouse "will generate revenues for the company, while its 1 Million per month, tissue culture starter plantlet production facility, Cannabis Biotech Complex, is under construction."  *See id.*

21
22
23
24
13.    The Website describes the focus of the Center as "to meet the rapidly increasing **Cannabis market demand** for medicinal quality starter plant material[,]" while the greenhouse space "will further allow for year-round nurseries safeguarding cultured and **developing plants for all growing seasons**."  *See id.* (emphases added).

25

26
27
28
[5] Notably, any value attributable to the Debtor's total ownership of WFS Pharmagreen, Inc. ("WFS") or its majority ownership of subsidiary 1155097 BC Ltd. ("115BC"), or of the value of WFS's marijuana licensure with Canadian authorities or the value of 115BC's interest in the Center or other assets, are absent from the Debtor's Schedules. *Compare* **Ex. 1** to Langsner Decl. at p. 7 Item 2 (describing Debtor's ownership of WFS and 115BC, as well as its use of "condensed . . . consolidated financial statements"), *with* ECF No. 28 pp. 2-4 of 15 (Schedule A/B, lacking such details).

14280-01/2495768.docx

14.    Intended on site research and development at the Center will include working to "enhance existing micro-propagation techniques for cultured plantlets and **help refine developing protocols for a variety of Cannabis strains for indoor and outdoor cannabis growers**." *Id.* (emphasis added).

15.    Debtor describes its intent that the Center serve as a model for future build-outs elsewhere in Canada and the world, noting its facility "for large-scale production, research and storage of . . . plantlets with consistent and certifiable constitute properties ensure the highest standards for safety and quality **of Cannabis as medicine**[,]" and that the Center is "in a unique position to lead the way in this exciting filed of **Cannabis biology**." *Id.* (emphases added).

16.    The Website describes Debtor's "Services" as "dedicated to breaking boundaries to become the most internationally recognized and valued biotech science solutions company in North America for . . . Cannabis products development [and others]." *See* **Exhibit "3"** to Langsner Decl.

17.    The Center "will produce approximately 10 million plantlets at full capacity[,]" and "greenhouse structures will be built on the property to provide nursery service for **cannabis plants** inclusive of indica, sativa and hemp strains for the cannabis cultivators." *Id.* (emphasis added).

18.    In addition, "Services" performed included "[e]xtraction service for **cannabis plant oils** . . . for all clients as well as for future production of **Pharmagreen brands of cannabis products for human use**." *Id.* (emphases added).

**DEBTOR HAS NO MEANINGFUL FINANCIAL PROSPECTS AND QUESTIONABLE LEADERSHIP**

19.    In May of 2020, the Debtor admitted that "the current funds available to the [Debtor] will not be sufficient to fund expenses related to maintaining our planned operations." *See* 10-Q, **Ex. 1** to Langsner Decl. at p. 18.

20.    Debtor also admitted it had "spent more funding on the planned build-out of our biotech complex, of which $98,406 was prepaid as at March 31, 2020. Prepaid expenses and deposits also include deferred financing costs of $250,000 associated with the Company's plan to

- 6 -

issue an Exchange Traded Note on the Vienna Stock Exchange."  *See* 10-Q, **Ex. 1** to Langsner

Decl. at p. 18.[6]

       21.    As of March 31, 2020, the Debtor had incurred a number of debts owed to insiders,

described to the SEC as "Related Party Transactions" as of March 31, 2020, as follows[7]:

- Owed $299,272 [US] (September 30, 2019 - $372,799 [US]) **to the President of the Company**,[8] which is non-interest bearing, unsecured, and due on demand. During the six months ended March 31, 2020, the Company **incurred consulting fees** of $48,841 (2019 - $45,288) to the President of the Company.

- Owed $nil (September 30, 2019 - $47,367 [US]) **to a company controlled by the President of the Company**, which is non-interest bearing, unsecured, and due on demand.

- Owed $51,766 [US] (September 30, 2019 - $55,500 [US]) **to the father of the President of the Company**, which is non-interest bearing, unsecured, and due on demand.

- Owed $24,087 [US] (September 30, 2019 - $25,825 [US]) **to a Company owned by the father of the President of the Company**, which is included in accounts payable and accrued liabilities. The amount due is non-interest bearing, unsecured, and due on demand.

- Owed $302,502 [US] (September 30, 2019 – $291,504 [US]) to **a company controlled by the Chief Financial Officer of WFS**, which is included in accounts payable and accrued liabilities. The amount due is non-interest bearing, unsecured, and due on demand. During the six months ended March 31, 2020, the Company **incurred consulting fees** of $48,841 (2019 - $45,288) to the company controlled by the Chief Financial Officer of WFS.

*See* 10-Q, **Ex. 1** to Langsner Decl. at p. 15 (emphases added).

---

[6] Interestingly, neither the prepayment of expenses, nor any deposits, nor the six figures in "deferred financing" are scheduled in Debtor's filings under penalty of perjury with this Court.  *See, e.g.*, Schedule A/B at Item 6 ("Does the debtor have any deposits or prepayments? No."); Item 59 ("Does the debtor have any interests in intangibles or intellectual property? No."); and Item 76 ("Other property of any kind not already listed. [None listed.]").

[7] These are noticeably absent from the Debtor's Schedules.  Specifically, *none* of these insider claims are listed in Debtor's Schedule E/F, filed under penalty of perjury.  *See* ECF No. 28 pp. 7-10 of 15.  *Compare id.*, *with* **Ex. 1** to Langsner Decl. at p. 15.

[8] Debtor Pharmagreen Biotech Inc. is defined as the "Company" in the 10-Q.  *See* 10-Q, **Ex. 1** to Langsner Decl. at Certification (last page).

- 7 -

14280-01/2495768.docx

22.    The Debtor has described there being "no changes in our internal control over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting." *See* 10-Q, **Ex. 1** to Langsner Decl. at p. 20.

23.    The Debtor admitted in filing with the SEC that, "as of March 31, 2020[,] disclosure controls and procedures were not effective **due to the existence of material weaknesses in our internal controls over financial reporting**." *See* 10-Q, **Ex. 1** to Langsner Decl. at p. 20 (emphasis added).

24.    Regarding prospects of successful operations, in May of 2020 the Debtor stated, "We are in the process of seeking additional equity financing . . . to fund our intended business operations." Also, "additional equity financing may not be available to us on acceptable terms or at all, and thus **we could fail to satisfy our future cash requirements**." *See* 10-Q, **Ex. 1** to Langsner Decl. at pp. 18-19.

25.    Given the paucity of assets scheduled [ECF No. 28], it does not appear from the Debtor's filings under oath that its financial prospects have improved since these statements were made to the SEC in May of 2020.

## IV.    ANALYSIS

"Several Courts have held that a bankruptcy case must be dismissed if the continuation of the case would require the court, trustee, or debtor in possession to administer assets that are illegal under the CSA or that constitute proceeds of activity criminalized by the CSA." *Burton v. Maney (In re Burton)*, 610 B.R. 633, 638 (B.A.P. 9th Cir. 2020) (collecting cases). [9]

**A.    Debtor's Planned Marijuana Business Is Not Authorized Under Federal Law.**

"Marijuana, . . . remains a Schedule I controlled substance under the [CSA]. The CSA prohibits, among other things, the manufacture, distribution, dispensing of, or possession with intent to manufacture, distribute, or dispense, a controlled substance." *Burton v. Maney (In re Burton)*, 610 B.R. 633, 627 (B.A.P. 9th Cir. 2020) (citations omitted). "It is clear that the Marijuana Business of [the debtor] is not authorized under the Controlled Substances Act." *In re*

---

[9] *Burton* has been reviewed and discussed or distinguished by Courts outside the Ninth Circuit, for example *In re Malul*, 614 B.R. 699 (Bankr. D. Colo. 2020).

14280-01/2495768.docx

*CWNevada*, 602 B.R. 717, 746 (Bankr. D. Nev. 2019). Further, Bankruptcy Courts in this District have dismissed bankruptcy cases in which debtors either receive or propose to receive income from a source authorized to distribute or cultivate marijuana. *See In re CWNevada*, 602 B.R. 717, 727 n.24 (Bankr. D. Nev. 2019) (collecting cases).

Here, the crux of the Debtor's business model and planned business operations is prohibited under federal law. Attestations in the 10-Q, which were made under criminal penalty and filed with the SEC, are that Debtor's long-term plans to generate revenue are dependent upon the cultivation and sale of marijuana. *See* 10-Q, **Ex. 1** to Langsner Decl. at pp 15, 17, 18.

Dismissal of this bankruptcy Case is therefore appropriate under 11 U.S.C. § 305(a) and, alternatively, under 11 U.S.C. § 1112(b).

**B.    Dismissal Is Appropriate Under 11 U.S.C. § 305(a).**

Dismissal of a chapter 11 bankruptcy case pursuant to 11 U.S.C. § 305(a) is also warranted when the "interests of creditors and the Debtor would be better served by dismissal of the case." *In re CWNevada LLC*, 602 B.R. 717, 747 (Bankr. D. Nev. 2019).[10]  11 U.S.C. § 305(a) provides in pertinent part:

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—(1) the interests of creditors and the debtor would be better served by such dismissal or suspension[.]

Here, the Debtor's proposed business model is based upon the development, cultivation, and sale of marijuana plantlets through and/or with its wholly-owned subsidiary WFS in furtherance of Debtor's "Brand". Debtor's proposal to build the Center, to obtain cannabis licensure under Canadian law, to utilize greenhouse science to grow marijuana plants in Canada twelve months out of the year, and to sell the products resulting therefrom all run afoul of United States federal law and the Controlled Substances Act. Furthermore, and impactful to the analysis

---

[10] In *CWNevada*, the Court was presented with a corporate chapter 11 debtor holding licenses duly issued under Nevada law for, inter alia, the cultivation and sale of medicinal and recreational marijuana, and the debtor was "in the business of cultivating, producing, and distributing medical and recreational marijuana[]" (and also had a portion of its business operations devoted to CBD). *CWNevada*, 602 B.R. at 723. However the marijuana business operated by the *CWNevada* debtor "appear[ed] to be the primary source of the Debtor's revenue and appear[ed] to be in clear violation of the Controlled Substances Act." *CWNevada*, 602 B.R. at 730.

14280-01/2495768.docx

of dismissal of this bankruptcy Case, Debtor's leadership has admitted to overspending the Debtor's funds previous to the Petition Date; failed to secure a revenue stream since discovering an inability to fund expenses as of at least March 31, 2020; filed conflicting statements under criminal penalty with the SEC and under penalty of perjury with this Court; and (for several months prepetition) identified material weaknesses in internal controls related to financial reporting but also admitted to not making changes to these controls.  Furthermore, a number of insider debts reported in the 10-Q have not been scheduled in this bankruptcy case, a number of assets described in Debtor's Website and 10-Q were not scheduled in this bankruptcy case, and Debtor's explanation of how it spent money in the several months preceding the Petition Date are inconsistent and confusing. Notably, the question of who holds what equity interests in this Debtor, and who exactly voted at the board meeting preceding the filing of the Corporate Resolution, are also not clear, even though the Debtor has made two separate filings under penalty of perjury **with this Court** regarding who holds what equity interests in it.

The conflicting statements under oath concerning assets, liabilities, and ownership; the admissions regarding failures in accounting practices and not making changes to materially affect these failures; the business model premised upon cannabis licensure in Canada to cultivate and sell marijuana and marijuana products year-round; and the Debtor's total lack of demonstrated financial capability to continue operations, altogether, indicate that the best interests of creditors and the Debtor are better served by dismissal of this bankruptcy Case.

**C.      Alternatively, Dismissal Is Appropriate Under 11 U.S.C. § 1112(b) For Gross Mismanagement of the Estate.**

11 U.S.C. § 1112(b)(1) begins with:

> Except as provided in paragraph (2) and subsection (c)[11], on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that

---

[11] This states, "The court may not convert a case under this chapter to a case under chapter 7 of this title if the debtor is a farmer or a corporation that is not a moneyed, business, or commercial corporation, unless the debtor requests such conversion."

- 10 -

14280-01/2495768.docx

HOLLEY DRIGGS

1    the appointment under section 1104(a) of a trustee or an examiner is
2    in the best interests of creditors and the estate.

3    This Court has broad discretion to determine what constitutes "cause" for dismissal under Section

4    1112(b)(1) of the Bankruptcy Code. *See Sanders v. U.S. Trustee (In re Sanders)*, 2013 WL

5    1490971, *6 (B.A.P. 9th Cir. Apr. 11, 2013).

6    **1.    Cause Exists Based on Debtor's Gross Mismanagement of the Estate.**

7    Section 1112(b)(4)(B) of the Bankruptcy Code[12] provides:

8    (4) For purposes of this subsection, the term "cause" includes— . . .
     (B) gross mismanagement of the estate[.]
9

10   Cause exists to dismiss this case because the Debtor's business model is premised upon

11   marijuana, which is illegal under the Controlled Substances Act. Operating and managing a

12   cannabis operation in violation of the Controlled Substances Act is considered to be "gross

13   mismanagement" within the terms of the statute.

14   **2.    Dismissal of this Case Accords With Prevailing Case Law in This Circuit.**

15   Here the Debtor is similar to the debtor in *In re CWNevada*, 602 B.R. 717 (Bankr. D. Nev.

16   2019), a recently filed bankruptcy case involving a marijuana business. In *CWNevada*, one of the

17   debtor's creditors sought to dismiss the chapter 11 case pursuant to 11 U.S.C. § 305(a) or, in the

18   alternative, 11 U.S.C. § 1112(b) primarily on the grounds that the debtor was engaged in the

19   marijuana business, a federally prohibited activity. The Court ultimately held that dismissal under

20   11 U.S.C. § 305(a) was warranted[13] because, *inter alia*, the debtor's marijuana business was not

21   authorized under the Controlled Substances Act,[14] and the debtor's financial issues were not

22   accurately portrayed by the debtor's management. *CWNevada*, 602 B.R. at 745-46.

23   In *Burton v. Maney (In re Burton)*, 610 B.R. 633, 627 (B.A.P. 9th Cir. 2020), the

24   Bankruptcy Appellate Panel ("BAP") affirmed dismissal of a chapter 13 bankruptcy where the

25

26   [12] 11 U.S.C. §§ 101 – 1532.

27   [13] Whether dismissal would have been warranted under Section 1112(b) was not addressed. *See, e.g.*, 602 B.R. at 747.

     [14] There was also no evidence that the debtor's CBD business did not run afoul of the Controlled Substances Act. *See,*
28   *e.g.*, *CWNevada*, 602 B.R. at 743.

14280-01/2495768.docx

1   debtors owned an interest in an entity that was not currently operational, but had commenced

2   litigation to recover on breach of contracts related to the growth and sale of marijuana.  Even

3   though *Burton* was a chapter 13 case, the debtors' relationship to a shuttered marijuana business

4   is apposite to the determination of whether Pharmagreen's bankruptcy should be dismissed

5   because, in *Burton*, it was the debtors' "connection with the marijuana business" under the

6   circumstances[15] that amounted to cause for dismissal.  *See Burton*, 610 B.R. at 639 n.10.

7          The *Burton* debtors had stated they did not "currently derive income from any entity

8   involved in the marijuana industry[,]" *Burton*, 610 B.R. at 634-35, were not currently involved in

9   the cannabis industry, and "were 'willing to get out of the [entity's] business entirely[,]'" *Burton*,

10   610 B.R. at 636.  However, the entity sought to recover funds "attributable to contracts under

11   which it was to serve as a cultivator, grower, holder, and/or seller of marijuana." *Burton*, 610 B.R.

12   at 636.

13          In its dismissal analysis, the Court also noted:

14          Given the nature[] of [the entity's] business, which was clearly
            involvement in the marijuana industry, neither a case trustee, nor
15          these Debtors, can sell or liquidate the [ownership interest] in the
            [entity], which is property of this estate through the bankruptcy case.
16          This would necessitate the Court and the Trustee's involvement in
            condoning the illegal activity.

17

18   *Burton*, 610 B.R. at 636-37.

19          Thus, despite the *Burton* debtors declaring under oath that the formerly operational

20   marijuana entity had gone out of business in advance of the Petition Date, had generated no income

21   since, was unlikely to recover money through its litigation,[16] and would not be relied upon to fund

22   a plan, the Court found that "[a]ny recovery from the litigation would be derived from conduct

23

24

25   ───────────────
[15] In addition, there was evidence (not, apparently, considered by the Bankruptcy Court), that the debtors held a 50%
26   membership interest in another entity engaged in the medical marijuana business.  *See Burton*, 610 B.R. at 636 n.7.

27   [16] Apparently, a contingency fee arrangement and a litigation financing lien were at play.  *Burton*, 610 B.R. at 635.
     Although, it seems the Court did not find the Debtors sufficiently proved that the litigation claims were worthless.
28   *Burton*, 610 B.R. at 639, n.11; *see also id.* at 640 (noting the debtors' failure to support assertions with proof that the
     litigation "would not result in their receipt of any litigation proceeds.").

- 12 -

14280-01/2495768.docx

1    that is illegal under federal law[.]" *Burton*, 610 B.R. at 635, 636.  Therefore, any distributions to

2    the debtors "would also be derived from illegal conduct." *Burton*, 610 B.R. at 637.

3          Here, although Pharmagreen is not yet operational as a cultivation and growth facility, its

4    entire business model is predicated upon WFG successfully obtaining cannabis licensure in

5    Canada, after which there will be developing, cultivating, and selling marijuana plantlets which

6    are grown in the cannabis biotech complex[17]—all of which will take place under the Debtor's

7    "brand."  Specifically, Pharmagreen states its "immediate focus will be on producing tissue

8    cultured high CBD hemp starter plantlets[,]" and "Management believes that if [funding events

9    succeed], we will generate sales revenue within twelve months thereof." *See* 10-Q at p. 18, Item 2.

10         Other Ninth Circuit law supports the conclusion that the Debtor's business runs afoul of

11   federal law, thus warranting dismissal of the bankruptcy case.  In *Garvin v. Cook Investments NW,*

12   *SPNWY, LLC (In re Cook Investments NW)*, 922 F.3d 1031 (9th Cir. 2019),[18] the Ninth Circuit

13   addressed the "good faith" requirement attendant to plan confirmation pursuant to 11 U.S.C.

14   § 1129(a)(3), when faced with confirmation premised in part on rental income from a marijuana

15   business.

16         *Garvin* involved five related real estate entities, one of which leased property to an

17   unrelated third party licensed under the State of Washington to grow marijuana.  The Ninth Circuit,

18   affirming plan confirmation, noted that an 11 U.S.C. § 1129(a)(3) challenge to the good faith of a

19   debtor in proposing its plan goes to whether the plan *is proposed in* good faith, not the good faith

20   of the terms that are themselves proposed.  *See Garvin*, 922 F.3d at 1034-35.

21         In *Garvin*, the United States Trustee had previously sought dismissal of the bankruptcy

22   under Section 1112(b) for the debtors' gross mismanagement, but this was denied without

23   prejudice based (in part) on the Debtors' representation that the lease violating the CSA would be

24   rejected (and, it later was).  *See, e.g.*, *Garvin*, 922 F.3d at 1033.  Nevertheless, *CWNevada*

---

[17] Pharmagreen maintains that WFS is in the third and final stage of obtaining cannabis licensure and that Pharmagreen "has begun site development work for the building process" of the biotech complex. *See* 10-Q at p. 18, Item 2.

[18] Discussed in *In re CWNevada*, 602 B.R. 717 (Bankr. D. Nev. 2019).

- 13 -

distinguished[19] *Garvin* on the basis that no plan was then pending before the (*CWNevada*) Court, and *Garvin* "did not preclude consideration of a motion to dismiss . . . ." *In re CWNevada*, 602 B.R. at 730. Client is likely to be able to avail itself similarly, in the event a dismissal motion is pending at a time when no plan has been proposed by Pharmagreen.

**3.    The Exceptions Set Forth in Section 1112(b)(2) Do Not Rescue the Case from Dismissal.**

11 U.S.C. § 1112(b)(2) provides:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that—
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)—
>     (i) for which there exists a reasonable justification for the act or omission; and
>     (ii) that will be cured within a reasonable period of time fixed by the court.

Here, there is no reasonable likelihood that a plan will be confirmed. Aside from the fact that the Debtor has admitted in the 10-Q and the Schedules, that it has no income, cash flow, or proposed source of financing, the Debtor's business model is predicated upon marijuana operations which are illegal.

. . .

. . .

. . .

. . .

---

[19] Courts in other Circuits have distinguished *Garvin* or taken issue with its analysis under Section 1129(a)(3). *See, e.g.*, *In re Way to Grow, Inc.*, 610 B.R. 338, 346-47 (D. Colo. 2019) (attesting that *Garvin* distinguished *In re Rent-Rite Super Kegs West Ltd.*, 484 B.R. 799 (Bankr. D. Colo. 2012) on a mistaken presumption about *Rent-Rite*'s analytical premise); *see also In re Basrah Custom Design, Inc.*, 600 B.R. 368, 381 n.38 (Bankr. E.D. Mich. 2019) (disagreeing with *Garvin*'s § 1129(a)(3) analysis and noting it would not be unreasonable to question whether the Ninth Circuit should have refused to decide the § 1112(b) issue raised by the United States Trustee on appeal).

- 14 -

HOLLEY DRIGGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOLLEY DRIGGS

## V.    CONCLUSION

For the foregoing reasons, Creditors respectfully request the Court grant the Motion and dismiss the Bankruptcy Case of Debtor Pharmagreen Biotech, Inc.

Dated this 28th day of August 2020.

**HOLLEY DRIGGS**

 /s/ Richard F. Holley
Richard F. Holley, Esq. (NV Bar No. 3077)
Mary Langsner, Ph.D. (NV Bar No. 13707)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

*Attorneys for PowerUp Lending Group, Ltd.;
and EMA Financial, LLC*

- 15 -

14280-01/2495768.docx

**HOLLEY DRIGGS**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I hereby certify that I am an employee of Holley Driggs, and that on the 28th day of August 2020, I caused to be served a true and correct copy of MOTION TO DISMISS BANKRUPTCY CASE in the following manner:

☒    (ELECTRONIC SERVICE)    Under Local Rule 5005 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by that Court's facilities.

☐    (UNITED STATES MAIL)    By depositing a copy of the above-referenced document for mailing in the United States Mail, first class postage prepaid, at Las Vegas, Nevada, to the parties listed on the attached service list, at their last known mailing addresses, on the date above written.

☐    (OVERNIGHT COURIER)    By depositing a true and correct copy of the above-referenced document for overnight delivery via Federal Express, at a collection facility maintained for such purpose, addressed to the parties on the attached service list, at their last known delivery address, on the date above written.

☐    (FACSIMILE)    That I served a true and correct copy of the above-referenced document via facsimile, to the facsimile numbers indicated, to those persons listed on the attached service list, on the date above written.

　　　　　　　　　　　　/s/ Olivia Swibies
　　　　　　　　　　　　An employee of Holley Driggs

14280-01/2495768.docx